# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ARTHUR L. JONES,

                Plaintiff,           Case No. 04-C-618

      v.

CITY OF MILWAUKEE, JOHN O. NORQUIST,
ROBERT J. WELCH, CARLA Y. CROSS,
ERIC MANDEL JOHNSON,
LEONARD J. SOBCZAK, ERNESTO A. BACA,
and ROSA DOMINGUEZ,

                Defendants.

## OPINION AND ORDER

        Arthur Jones, former police chief of Milwaukee, Wisconsin, is suing the City of Milwaukee and John Norquist, a former Milwaukee mayor, as well as six present or former members of the Milwaukee Fire and Police Commission. Jones claims that the Defendants discriminated against him and retaliated against him in the course of his employment because he is African American. He also claims that the individual Defendants deprived him of rights under the First, Fourth and Fourteenth Amendments. In addition, he alleges that the former mayor and his appointees on the Fire and Police Commission conspired against him to deprive him of equal protection. He is seeking two million dollars in monetary relief and punitive damages pursuant to 42 U.S.C. §§ 1983 &1985, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq.

After the deadline passed for the completion of all discovery, the Defendants moved for summary judgment on the grounds that no material facts are in dispute and that they are entitled to judgment as a matter of law. See Federal Rule of Civil Procedure 56(c). This motion is now fully briefed.

## I. FACTS

Arthur Jones was appointed as the City of Milwaukee's Chief of Police on November 15, 1996. His appointment by the Fire and Police Commission was backed by Defendant John Norquist, who had been elected mayor in 1988. Prior to his appointment as Chief, Jones had served as supervisor of the mayor's security detail. The Fire and Police Commission chose Jones over other candidates. Jones served until his term expired on November 18, 2003.

On June 5, 2002, while still employed as Chief, Jones, who is African American, filed a claim of race discrimination with the Equal Employment Opportunity Commission. After he retired, he added a claim of retaliation and received a right-to-sue letter on April 1, 2004. He filed this federal lawsuit on June 25, 2004.

In his Complaint, Jones claims that in December of 1999, he refused Defendant Norquists's request to persuade a female city employee (Marilyn Figueroa) not to file a sexual harassment claim involving the then-mayor Norquist. Jones alleges that, from that time onward, the mayor, in retaliation, subjected him to public attacks and poor performance reviews. He says that he was harassed and held to standards that were not imposed upon any prior police chiefs (none of whom were African American).

After Norquist was elected to a fourth term on April 4, 2000, he formed the Milwaukee Anti-Crime Commission. Jones was a member as were many community leaders. After the Commission's report was issued, the recommendations were sent to Jones for review. The Defendants say that Jones refused to adopt their recommendation to decentralize authority. Consequently, Jones' performance review for the year 2000, was less than favorable. Nevertheless, he was eventually granted a retroactive pay raise. Shortly thereafter, a local newspaper reported that arrests were dropping while Jones' internal investigations of police personnel were increasing. In November of 2000, Norquist presented a program to community groups showing that the violent crime rate in Milwaukee was increasing.

Jones claims that, beginning in 2001, Defendant Robert Welch, who was chairman of the Fire and Police Commission, began to criticize him in the press for such things as his budget and internal investigations. Jones maintains that, contrary to Welch's statements, crime was decreasing in Milwaukee and the department was being operated within its budget. Jones accuses Welch of calling him "Ace," during one heated exchange. Jones regards this word as racially derogatory. He interprets it as referring to the ace of spades. Jones, in turn, called Mayor Norquist "Massa" and called two African American members of the Fire and Police Commission "Uncle Toms."

Eventually, relations among the mayor, members of the Board of Fire and Police Commissioners, and Jones deteriorated to a point where Jones claims that Norquist asked him to quit. In April of 2002, Jones refused to appear for his performance review. After four people were murdered in Milwaukee on a single day in

3

November of 2002, the Board issued a directive to Jones to prepare a plan for reducing homicides and gun-related crimes.

Jones contends that Norquist's crime initiatives were all undertaken to make him look bad in the African American community. He says that the mayor told groups that Jones did not care about the escalating homicides. Jones believes that: "Norquist used the Mayor's Commission on Crime as a means of retaliating against Jones and belittling his position as Chief of Police." <u>See</u> Plaintiff's Proposed Findings of Fact at ¶ 54. Meanwhile, Jones formed his own Community Safety Coalition which studied a model program used in Boston to reduce crime.

In sum, Jones alleges that:

> "From the year 2000 onward, because of the Defendants' discrimination and retaliation, Jones suffered adverse employment actions in having his duties and authority as chief of police curtailed. Jones was disciplined and demoted in the sense that Jones was prevented from exercising his authority and duties as the chief of police.
>
> Jones was humiliated and denied the opportunity to serve a second term as chief of police."

<u>Id</u>. at ¶ 162,

## II. <u>THRESHOLD ISSUES</u>

### A. UNTIMELY CLAIMS

As a preliminary matter, the Defendants argue that evidence of any allegedly discriminatory acts (including the "PowerPoint" presentations by Norquist to African American clergy) which occurred more than 300 days prior to the filing of Jones' EEOC complaint on June 5, 2002, are time barred. Title VII requires that a claimant

4

file a charge with the EEOC and a state or local agency within 300 days of the allegedly discriminatory act.  See 42 U.S.C. § 2000e-5(e)(1).

In response, the Plaintiff appears to agree that any acts outside the 300-day limitation period are barred as independent claims, but maintains that they may be introduced as evidence in support of timely claims.  He cites National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 113 and Selan v. Kiley, 969 F.2d 560, 567 (7th Cir. 1992) to support his argument, while at the same time he says that he is not relying on a continuing violation theory to introduce the untimely acts.  National Railroad Passenger Corporation v. Morgan was a continuing violation case as was Selan v. Kiley.  In fact, the Seventh Circuit has merely left open the question of whether time-barred acts might be considered as relevant background evidence for a plaintiff's timely claims.  See Davis v. Con-Way Transportation Central Express, Inc., 368 F.3d 776, 786 n.4 (7th Cir. 2004).  Therefore, unless the Seventh Circuit rules otherwise, the court will bar all evidence of acts occurring more than three hundred days before Jones filed his administrative claim.

This ruling does not apply to Jones' claims for relief under Sections 1983 and 1985.  The 300-day limitation period does not apply to these claims.

B.  QUALIFIED IMMUNITY

Next, the individual Defendants argue that they are entitled to qualified immunity from suit.  The qualified immunity doctrine shields a government actor from further litigation unless the plaintiff can demonstrate: (1) the violation of a constitutional right that is (2) clearly established at the time of the violation, so that a reasonable

5

public official would have known that his conduct was unlawful.  See Bleavins v. Bartels, 422 F.3d 445, 450 (7th Cir. 2005).

It appears that the Defendants are raising qualified immunity as a defense to the two Title VII claims.  They write that "the two events of alleged race-based discrimination in this record, Norquist's presentations to African-American clergy and Welch's use of the term "Ace," even taken in a light most favorable to the Plaintiff do not amount to race discrimination."  Defendants' Brief in Support of Motion for Summary Judgment at 23.

Qualified immunity is not a defense to a Title VII action.  See Wu v. Thomas, 996 F.2d 271, 273 (11th Cir. 1993), cert. denied, sub. nom. Wu v. Board of Trustees, 511 U.S. 1033 (1994).  Qualified immunity is a defense which can be invoked only by a person who is sued for money damages in his or her individual capacity.[1]  See Levenstein v. Salafsky, 414 F.3d 767, 772 (7th Cir. 2005).  The only proper Defendant in a Title VII action is the employer.  See 42 U.S.C. § 2000e-5(b) & (g).  In this case, the City of Milwaukee was Jones' employer and the City is not entitled to qualified immunity.  See generally Owen v. City of Independence, Missouri, 445 U.S. 622 (1980).  See also Brandon v. Holt, 469 U.S. 464, 470 (1985).

In addition to the Title VII claims, Jones is asserting a claim directly under the Equal Protection Clause for employment discrimination.  While the individual

---

[1]  In his Complaint, the Plaintiff does not specify whether he is suing the individual Defendants in their official or personal capacities.  The Plaintiff has not moved to substitute any successors in office for any of the Defendants, and the Defendants have raised the defense of qualified immunity.  Thus, for the most part, the parties have treated the claims as being made against the individuals in their personal capacities.  Nevertheless, in his brief, Jones belatedly asks permission to amend his Complaint to assert claims against the Defendants in their official capacities.  This untimely request will not be granted.

6

Defendants could be entitled to qualified immunity on this claim, the claim is intertwined with the merits which will be discussed below.

The remaining claims made by Jones are for deprivation of his liberty interest in his reputation, for retaliation for exercising First Amendment rights, and for conspiracy. It does not appear that the Defendants are claiming qualified immunity from suit over these claims. If they are, their arguments are too undeveloped for the court to address them. Under these circumstances, the court will not grant qualified immunity to any of the individual Defendants.

### III. <u>TITLE VII</u>

The Plaintiff asserts two claims for relief under Title VII of the Civil Rights Act of 1964, against his former employer, the City of Milwaukee. Jones says that the City discriminated against him on the basis of race[2] and that it retaliated against him for refusing to discourage another city employee from filing a discrimination claim. The Defendants have moved for summary judgment on these claims.

### A. LEGAL STANDARDS

Summary judgment is appropriate only when the pleadings, depositions, and other materials in the record demonstrate that there are no genuine issues of material fact and that the moving parties are entitled to judgment as a matter of law. See <u>Adreani v. First Colonial Bankshares Corporation</u>, 154 F.3d 389, 393 (7th Cir.

---

[2] The Plaintiff alleges a series of actions by the Defendants whom he claims discriminated against him on the basis of race when he served as Milwaukee's Chief of Police. It would appear that Jones is stating a claim for a hostile environment. Jones' EEOC charge described and mentioned a hostile environment. <u>See</u> Affidavit of Anna M. Papelnjak at ¶¶ 2 & 3 and attached exhibits. Nevertheless, the parties have briefed the claims as discrete acts of alleged race discrimination. The Plaintiff has not asked the court to address a hostile environment claim.

7

1998). The evidence must be considered in a light most favorable to the nonmovant and all reasonable inferences must be drawn in favor of the nonmovant. See Bell v. Environmental Protection Agency, 232 F.3d 546, 549 97th Cir. 1000). To defeat a motion for summary judgment, the nonmoving party cannot rest on his pleadings, but must demonstrate that specific, material facts exist which give rise to a genuine issue. See Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986).

A "genuine" factual issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either side. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Conclusory allegations by the party opposing the motion cannot defeat the motion. See Hedberg v. Indiana Bell Telephone Company, 47 F.3d 928, 931 (7th Cir. 1995). The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. See Matsushita Electronic Industries Company v. Zenith Radio Corporation, 475 U.S. 574 (1986),

A summary judgment procedure is not meant to be a trial on affidavits. Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. At the summary judgment stage the judge's function is to determine whether there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See First National Bank of Arizona v. Cities Service Company, 391 U.S. 253, 288-89 (1968).

This inquiry implicates the substantive evidentiary standard of proof that would apply at a trial on the merits which, in this case, is a preponderance of the evidence.

The court must now apply these procedural standards, as well as the substantive law developed under Title VII and the First, Fourth and Fourteenth Amendments, to the undisputed facts of this case.

## B. DISCRIMINATION

A plaintiff may prove intentional discrimination under Title VII or the Equal Protection Clause through direct or circumstantial evidence (direct method) or resort to the indirect burden-shifting method described in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Under the direct method, a claimant must show either "an acknowledgment of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." Gorence v. Eagle Food Containers, Inc., 242 F.3d 759, 762 (7th Cir. 2001). Under McDonnell Douglas, a plaintiff attempting to prevail on a case of race discrimination using the indirect method must establish four prongs: first, that he is a member of a protected class; second, that he was meeting his employer's legitimate performance expectations; third, that he suffered an adverse employment action; and fourth, that he was treated less favorably than similarly situated individuals who are not members of his protected class. See Ballance v. City of Springfield, 424 F.3d 614, 617 (7th Cir. 2005). Once the plaintiff has satisfied these elements, the burden of production shifts to the defendants to put forth a legitimate, non-discriminatory reason for the challenged actions. If the defendant meets this burden, the burden then shifts to the plaintiff to show that the

9

articulated reason is pretextual. See Hoffman-Dombrowski v. Arlington International Racecourse, Inc., 254 F.3d 644, 650 (7th Cir. 2001).

Jones does not cite any direct evidence of discrimination. Instead, he relies on the indirect method of proof. Jones argues that:

> With respect to the indirect method of proof: Jones is a member of a protected class. He has met the defendants' legitimate work expectations. The defendants took adverse employment action against Jones by continually denigrating his authority and status of Chief of Police. It is clear that the defendants did not take such employment actions against any other chief, before or after Chief Jones.

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 24 (citation omitted). The parties agree that Jones is a member of a protected class, but the Defendants deny that he was meeting the City's legitimate performance expectations; that he suffered an adverse employment action; and that he was treated less favorably than similarly situated employees.

The material facts are in dispute as to whether Jones was meeting the legitimate expectations of the City of Milwaukee. The "similarly situated" prong of the McDonnell Douglas test drops out in this case. Jones maintains that all other Milwaukee police chiefs are the employees who are similarly situated to himself, while the Defendants contend that he should be compared to the fire chief. There is nothing in the record to show that any other chiefs of police were employees of the City of Milwaukee while Jones was chief. The court finds that the chief of police position was unique during the time in question. When a job is unique, the Seventh Circuit dispenses with the requirement that a plaintiff show "similarly situated" employees who

10

were treated more favorably.  See Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 693 (7th Cir. 2000).

The "adverse employment action" prong of the McDonnell Douglas test is problematic in this case.  Jones does not allege any economic injury.  He was not fired actually or constructively.  And, he was not demoted or reassigned.  In essence, he is saying that creating a hostile job environment is the adverse action taken by the Defendants.

There is a split among the circuits over the issue of whether a plaintiff must prove economic injury in order to show an adverse employment action within the meaning of Title VII.  The Fourth Circuit takes the position that a plaintiff must show economic injury.  See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371 (4th Cir.), cert. denied, 125 S.Ct. 423 (2004).  The Seventh Circuit does not regard economic loss as an essential element.  That court has described three situations which can be considered adverse employment actions:

> 1. Cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including, of course, as the limiting case, termination of employment. See, e.g., Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 876 (7th Cir.1999); Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir.1996); Greer v. St. Louis Regional Medical Center, 258 F.3d 843, 845-46 (8th Cir.2001).
>
> 2. Cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted. See, e.g., Flaherty v. Gas Research Institute, 31 F.3d 451, 456-57 (7th Cir.1994); Crady v. Liberty National Bank & Trust Co., 993 F.2d 132, 135- 36 (7th Cir.1993);

11

Collins v. Illinois, 830 F.2d 692, 703-04 (7th Cir.1987); Rodriguez v. Board of Education, 620 F.2d 362, 366 (2d Cir.1980); Torre v. Casio, Inc., 42 F.3d 825, 831, 834-35 and n. 7 (3d Cir.1994). These cases differ from those in the first category only in involving a future rather than present harm; the harm nevertheless is financial. They are to be distinguished from cases involving "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance.... [Such a transfer] cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir.1996).

2a. A variant of category 2 is where the employee's job is changed in a way that injures his career, just as in the cases in that category, except that there is no transfer. See, e.g., Dahm v. Flynn, 60 F.3d 253, 256-57 (7th Cir.1994); Chuang v. University of California Davis, 225 F.3d 1115, 1125- 26 (9th Cir.2000).

3. Cases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the conditions in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment--an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet. See, e.g., Smart v. Ball State University, supra, 89 F.3d at 441 n. 1; Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152-53 (3d Cir.1999); Parrish v. Immanuel Medical Center, 92 F.3d 727, 731-32 (8th Cir.1996); *745 see also Spring v. Sheboygan Area School District, 865 F.2d 883, 885-86 (7th Cir.1989); Meyer v. Brown & Root Construction Co., 661 F.2d 369, 372 (5th Cir.1981); cf. Parrett v. City of Connersville, 737 F.2d 690, 693-94 (7th Cir.1984). This category includes cases of constructive discharge: the employer has made the job unbearable for the employee. E.g., id.; EEOC v. University of Chicago Hospitals, 276 F.3d 326, 331-32 (7th Cir.2002); Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir.1998). It also includes cases of harassment--mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen

12

> substantially his conditions of employment as they would
> be perceived by a reasonable person in the position of the
> employee. Faragher v. City of Boca Raton, 524 U.S. 775,
> 786-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998);
> Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462-63 (7th
> Cir.2002). Categories 2, 2a, and 3 often overlap. See, e.g.,
> Collins v. Illinois, supra, 830 F.2d at 703-04.

Herrnreiter v. Chicago Housing Authority, 315 F.3d 742,, 744-45 (7th Cir. 2002).

Although Jones has cast his Complaint and his summary judgment arguments in language that mirrors the third Herrnreiter category of employment action, Jones has not introduced sufficient factual material into the record to support his position. Reviewing Jones' proposed findings and comparing them to the underlying documents, the court is disturbed to find that, in many instances, the proposed findings are not supported by the underlying documents. The quotations supposedly taken from the depositions are edited so as to ascribe a different meaning from the meaning the deponent expresses in context.

The hostile atmosphere claimed by Jones dates from December of 1999, when Jones refused to involve himself in discouraging city employee Marilyn Figueroa from filing a discrimination claim. First, Jones blames former mayor Norquist for the hostility. Following Norquist's reelection in April of 2000, the mayor formed the Milwaukee Anti-Crime Commission, while Jones had already formed a Community Safety Coalition. As head of the Anti-Crime Commission, Norquist addressed groups of African American community leaders. It is undisputed that Jones did not attend the mayor's presentations and it is undisputed that Jones' name was not mentioned during the presentations. Yet, Jones speculates that the presentations were implied criticisms of his job performance. The only support the Plaintiff offers for this speculation is

hearsay. He says he recalls that former Alderman Marvin Pratt told him that he attended a meeting at which the mayor appeared uninvited and "disparaged Jones, stating that Jones did not care about the number of homicides in the African-American community." Plaintiff's Proposed Findings of Fact at ¶ 44. What Marvin Pratt actually says in his affidavit is that:

> 5. In approximately the Summer or early Fall of 2000, I was invited by Mayor Norquist to a meeting at the Mayor's office. Norquist also invited a group of prominent black preachers from Milwaukee to attend this meeting. At this meeting, Norquist made a power-point presentation and spoke to us about the crime rates in the City of Milwaukee, and specifically in the African American communities. Although Norquist did not say so expressly, the implied theme of the Mayor's presentation was that Police Chief Arthur Jones was doing a bad job of fighting crime in the parts of the city which are most strongly effected by crime, i.e. African American communities. My impression of the Mayor's presentation was that he was attempting to shift the support of the African American community away from Arthur Jones.

> 6. Later, in approximately end of November 2000, I was present at a public meeting that was held at Gospel Lutheran Church in the city of Milwaukee. Attendees of this meeting were predominantly members of the African American Milwaukee community. Mayor Norquist also made an appearance at that meeting and made an oral presentation that addressed the same topics that he discussed at the meeting in his office earlier that year.

> 7. One of the main themes of Norquist's presentation at the November 2000 meeting was that violent crime was on the rise in the African American communities, and that Chief Jones was not doing a good job of addressing this problem.

Affidavit of Marvin Pratt at ¶¶ 5, 6 & 7. Pratt's affidavit does not offer support for Jones' case because it only contains opinions and subjective inferences drawn by Pratt. With

14

no potentially admissible evidence to support his position, Jones offers the conclusory statement that: "Norquist used the Mayor's Commission on Crime as a means of retaliating against Jones and belittling his position as Chief of Police." Plaintiff's Proposed Findings of Fact at ¶ 54.

Next Jones complains that the Fire and Police Commission harassed him. On August 1, 2000, the mayor's Anti-Crime Commission issued its report. The Fire and Police Commission ordered Jones to implement the Commission's recommendations. Jones' performance evaluation was postponed and Jones was given a chance to respond to the recommendations. When the performance evaluation was completed on October 6, 2000, Jones rated lower than he had in previous evaluations in all but one category. Nevertheless, he suffered no economic detriment or job action. In January of 2001, Milwaukee's Chief of Police became subject to quarterly performance reviews. Defendant Welch, the Chairman of the Fire and Police Commission, criticized Jones in press interviews. The Chief and the Chairman clashed in the media over the numbers of officers being disciplined. They also clashed at meetings, and at one point Welch called Jones "Ace," a name Jones subjectively interpreted as referring to the ace of spades. He attempts to offer the testimony of Defendant Norquist as objective evidence that "Ace" is a racist term. He says that: "Norquist acknowledged that a person could interpret calling Jones 'Ace' as a demeaning racial remark." Plaintiff's Proposed Fact at ¶ 112. What Norquist actually said at his deposition was:

> A. I think it's hard to make the case that Ace is somehow a racial perjorative. I'd never thought of it as that, but I can see how somebody else would interpret it differently. That was in a – as I understand, it was in an executive session, so it – the only way the press

15

> found out about it is if it was – somebody told them that he said it. I'm not sure about that, but that's my recollection.
>
> Q. Did you have any discussion with him about that?
>
> A. No, because I don't think he meant Ace as a – the only Ace I remember in Milwaukee was Ace Vollmer, who was a second string forward for Marquette.
>
> Q. It was obviously not meant as a compliment to Chief Jones, right?
>
> A. No. I don't know – I don't know whether it was a compliment or like saying hey man or hey guy or something like that. But when you get into the question of Ace, you know, I don't think the common use of the term has anything to do with, say, race, for example.

Affidavit of John Machulak at Exhibit E (deposition of John Norquist) at 217. Other than this single instance of name-calling, which Jones has not shown was objectively racist, Jones has no evidence to link any of the actions taken by the mayor or by the Fire and Police Commissioners to be biased against him because he is African American.

The Fire and Police Commissioner issued a directive to Jones to develop a plan to cope with gun-related crimes. Jones complied in January of 2003. Although Jones appears to take offense at the directive, Wisconsin law provides that issuing directives to a chief is one of the duties of a Fire and Police Commission:

> **(23)** DUTIES OF CHIEF. The chief engineer of the fire department and the chief of police of a 1st class city, shall be the head of their respective departments. The chief of police shall preserve the public peace and enforce all laws and ordinances of the city. The chiefs shall be responsible for the efficiency and general good conduct of the department under their control. The board may review the efficiency and general good conduct of the departments.

16

> A chief shall act as an adviser to the board when the board reviews his or her department. The board may issue written directives to a chief based on a review of the chief's department. The chief receiving a directive shall implement the directive unless the directive is overruled in writing by the mayor. Each of the chiefs shall maintain and have custody of all property of their respective departments, including but not limited to, all books and records, which shall be available and subject to inspection by the board.

Wis. Stat. § 62.50(23).

Having reviewed the evidence, the court concludes that Jones has not raised a triable issue as to whether he was subjected to an adverse employment action. The hostile atmosphere he describes in hyperbolic terms is supported mainly by his own opinions. Moreover, he has cited no law establishing that Title VII is meant to shield high level public officials from job-related public criticism by other government officials. On the basis of this record, no reasonable jury could find that the Defendants created objectively severe hardships for Jones in the workplace. Jones himself admits that, despite the work atmosphere, he applied for a second term as chief. Therefore, because Jones has not established the "adverse action" prong of his *prima facie* case of discrimination, the court will grant summary judgment in favor of the Defendants on these claims.

## C. RETALIATION

To state a claim of retaliation a plaintiff must prove: (1) that he engaged in statutorily protected activity; (2) that he sustained an adverse action by the employer; and (3) that there is a causal link between the protected activity and the employer's action. See Equal Employment Opportunity Commission v. Yellow Freight System,

Case 2:04-cv-00618-TJC   Filed 11/03/05   Page 17 of 27   Document 84

Inc., 253 F.3d 943, 952 (7th Cir. 2001( (en banc).  See also generally Schobert v.

Illinois Department of Transportation, 3004 F.3d 725 (7th Cir. 2002).

      The Defendants argue that Jones has no direct or circumstantial evidence

of retaliation, but Jones responds that:

> In fact, there is substantial direct evidence of retaliation.  In looking at the sequence of events, every effort on the part of Jones to resist the defendants' efforts to denigrate his position as Chief of Police results in more serious retaliation.  In the beginning, the retaliation takes the form of performance reviews, which may or may not find themselves in the public domain.  Two years later, Jones' competency is characterized as a "fart in the windstorm" while the record shows that crime is going down and the police department was in budget.

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 24.

      The Defendants take the position that there was no adverse action, while

the Plaintiff explains that:

> . . . Jones has alleged in his complaint that he "was subjected to continuous unfounded public attacks on his character and his leadership" and that "[i]n addition to publicly attacking Jones, the defendants embarked on a campaign to reduce the powers and responsibilities assigned to the plaintiff by virtue of his public office and to undermine his ability to properly perform his job."  Jones alleges that "[t]he defendants' actions were motivated by their belief that Jones, as an African American Chief of Police, ought to be collared and made to follow the directives of a Mayoral appointed board and that he have only token appointment to an office of authority."  He was seriously injured in his reputation and professional standing, and the actions of the defendants undermined his ability to perform his job functions with the view toward making him subordinate as no other chief of police had ever been.
>
> As the defendants themselves state in their brief, an actionable adverse employment action includes a

18

qualitative or quantitative change in the terms or conditions of employment. Here, Jones has alleged that the treatment he sustained affected both his career at the Milwaukee Police Department and his career. In the very recent case of <u>Tart v. Illinois Power Co.</u>, 366 F.3d 461, 474 (7th Cir. 2004), the Court noted that a materially adverse change in the terms or conditions of employment may be indicated by, among other things, "significantly diminished material responsibilities or other indices that might be unique to a particular situation," citing, <u>Crady v. Liberty National Bank & Trust Co. of Indiana</u>, 993 F.2d 132. 136 (7th Cir. 1933). While Chief Jones was not, as the plaintiff in <u>Tart</u> was, transferred from a desk job to a winter field job under a supervisor whom he had formerly supervised (but with no change in salary or benefits), he was subjected by the defendants to a degree of supervision unprecedented for the Chief of Police. . . .

Here, Chief Jones was subjected to nonstop efforts by his employer to reduce his responsibilities and undermine his authority which were both humiliating and degrading, and which constituted a "significantly negative alteration in his workplace environment."

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 10-21

(citations and footnote omitted).

In <u>Herrnreiter v. Chicago Housing Authority</u>, 315 F.3d 742 (7th Cir. 2002),

Judge Posner wrote that "we do not necessarily endorse the view: that an adverse

employment action is always required to make retaliation actionable under Title VII."

<u>Id</u>. at 746. He gives the example of an employer retaliating against an employee for

filing a discrimination complaint by shooting him. That action would be adverse, even

though it was not an employment action. Likewise, in this case, the Defendants did not

fire, demote, or transfer Jones. Jones has alleged that they retaliated by demeaning

and humiliating him for an extended period of time. Nevertheless, his claim fails

because he does not connect most of these alleged acts of retaliation to his protected

19

activity (refusing to discourage Marilyn Figueroa from filing a discrimination claim) and because, for the reasons explained above in Part A, he cannot establish a severe adverse action by the Defendants. Therefore, the court will grant summary judgment in favor of the Defendants on Jones' retaliation claim.

## IV. **SECTION 1983**

In addition to his Title VII claims, Jones alleges that the Defendants deprived him of his right to equal protection and his right to a due process interest in his reputation, and that they retaliated when he exercised his First Amendment right to free speech.

### A. EQUAL PROTECTION

An equal protection claim made under Section 1983 is governed by the same substantive law as claims made under Title VII. See Steinhauer v. DeGolier, 359 F.3d 481, 483 (7th Cir. 2004). Therefore, because the court has concluded that Jones cannot maintain an employment discrimination or retaliation claim under Title VII because he has been unable to establish that he was subjected to an adverse action by the Defendants, his section 1983 equal protection claim is not viable.

### B. DUE PROCESS

Next, Jones claims that he was deprived of his liberty interest in his reputation. In his brief he describes his claim as follows:

> . . . . Analyzing the statements made against him by John Norquist (to the African-American community) and by Woody Welch, the outright slander against Jones amounts to more than mere charges of mismanagement, or the like. Jones has built his life in Milwaukee, Wisconsin, being in the public service for thirty-six years on the police

20

department, culminating with his appointment as the Chief of Police. There is more than an issue of fact as to whether John Norquist telling members of the African-American community that Jones does not care about crime committed against African-Americans is more than a statement implying mismanagement. Woody Welch's statements to the effect that Chief Jones' strategies to fight violent crime "have had the effect of a fart in a windstorm" and/or that the police department was being run as a repressive regime "like a french [sic] penal colony" are words designed to attack an individual's good name, reputation, honor, and integrity.

Welch stated that Jones, "instead of plotting a strategy to cut down on gun violence in Milwaukee, Jones is busy investigating his own cops over stuff like broken tail lights." Such words do not confine themselves to being a bad manager. They are a vicious attack upon a person whose good name, reputation, honor and/or integrity are essential to his remaining in public office.

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 26 (citations omitted).

A plaintiff seeking relief under Section 1983 may state a claim for deprivation of liberty by alleging damage to his reputation so long as he also asserts that the government altered a right or status he previously held under state law. See Paul v. Davis, 424 U.S. 693, 708-11 (1976). See also Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972). In Paul v. Davis, the United States Supreme Court held that an injury to reputation, without more, does not implicate due process. See Paul v. Davis, 424 U.S. at 712. Since there is no protected liberty interest in reputation alone, the employment status must be distinctly altered or extinguished to trigger due process protection. See Id. at 711.

21

In the situation at hand, Jones was not dismissed, nor was he transferred or demoted to an inferior position. He points out that he was not rehired after his term expired. However, he does not allege that he was foreclosed from any other job opportunities.

In Roth, the Supreme Court said that: "It stretches the concept [of liberty] too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job, but remains as free as before to seek another." Roth, 408 U.S. at 575. Jones has submitted nothing to establish that it is virtually impossible for him to find new employment in his chosen field. See Townsend v. Vallas, 256 F.3d 661, 670 (7th Cir. 2001). Consequently, he cannot obtain relief on his due process claim that he was deprived of occupational liberty.

## C. FIRST AMENDMENT

A third Section 1983 claim raised by Jones is that the Defendants retaliated against him for exercising his First Amendment rights. In his principal brief, he says that:

> Jones clearly engaged in speech on matters of public concern from 2000 through 2002. In the beginning of 2000, he expressed his refusal to assist the Mayor in persuading Ms. Figueroa not to file a sexual harassment complaint against the City and the defendant Norquist. He later wrote several letters of opposition to the discriminatory and harassing treatment that he was being subjected to by Commissioner Welch and the FPC. Eventually, in June of 2002, Jones had no other alternative but to file a discrimination and retaliation complaint with the EEOC against the FPC and the City of Milwaukee. Clearly, Jones' repeated objections to the defendants' unlawful conduct and treatment of him, constitute a matter of significant concern to the community. This is further underlined by the

22

significant amount of media coverage that Jones' disputes with the FPC and Norquist received in the local media.

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 27 (citations omitted).

The Seventh Circuit has explained that:

A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." City of San Diego v. Roe, --- U.S. ----, ----, 125 S.Ct. 521, 523, 160 L.Ed.2d 410 (2004). Because "the government as an employer has an interest in conducting its operations as effectively as possible," however, "public employees do not have an unfettered right to express themselves on matters related to their jobs, and courts must give due weight to the government's interest in efficient employment decision making when evaluating retaliation claims." Brooks v. Univ. of Wis. Bd. of Regents, 406 F.3d 476, 479 (7th Cir.2005) (citing Cygan v. Wis. Dep't of Corr., 388 F.Cir.2004); Waters v. Churchill, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)). To establish a claim of First Amendment retaliation, a plaintiff must prove "that the speech in question is constitutionally protected and that it was a substantial, or motivating, factor in the employer's retaliatory actions." Brooks, 406 F.3d at 479. "If the plaintiff establishes these elements, the burden shifts to the government to prove that it would have taken the same action in the absence of the protected speech." Id. . . . .

In determining whether a government employee's speech is constitutionally protected, we apply the two-step Connick-Pickering test. Cygan, 388 F.3d at 1099 (citing Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). First, under Connick, we must determine whether the employee spoke "as a citizen upon matters of public concern." Connick, 461 U.S. at 147, 103 S.Ct. 1684; see also Cygan, 388 F.3d at 1099. In making this determination, we examine "the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S.Ct. 1684.

23

> Second, under Pickering, we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. 1731; see also Cygan, 388 F.3d at 1099.

Schad v. Jones, 415 F.3d 671 (7th Cir. 2005), petition for cert. filed, (U.S. October 10, 2005) (N o. 05-469).

On October 12, 2005, the United States Supreme Court heard arguments in the case of Ceballos v, Garcetti , 361 F.3d 1168 (9th Cir. 2004), cert. granted, 125 S. Ct. 1395 (2005). The Court has been asked to decide whether a public employee's purely job related speech, expressed strictly pursuant to the duties of employment, is cloaked with First Amendment protection simply because it touches on a matter of public concern, or whether First Amendment protection also requires the speech to be engaged in as a citizen. See Garcetti v. Ceballos, 2004 WL 2260964 (U.S. October 1, 2004) (No. 04-473) (petition for writ of certiorari). There is a split among the circuits on this issue, with some circuits, including the Seventh Circuit, ruling that a plaintiff must prove that he or she was speaking as a citizen, not merely as an employee. See, e.g., Schad v. Jones, 415 F.3d 671 (7th Cir. 2005), petition for cert. filed (U.S. October 10, 2005) (N o. 05-469) (in which Defendant Arthur Jones (the Plaintiff in the instant case) takes the position that a public employee plaintiff must prove that he or she was speaking as a citizen, not merely as an employee). Other circuits, such as the Ninth in the Ceballos case, do not require a plaintiff to prove that element. Rather, those courts focus on whether the public employee's speech would be of relevance to the

24

public's evaluation of the performance of governmental agencies.  See, e.g., Ceballos v. Garcetti., 361 F.3d 1165 (9th Cir. 2004), cert. granted, 125 S. Ct. 1395 (2005).

Until the United States Supreme Court has ruled, this court must follow precedent in the Seventh Circuit.  In support of his claim, Jones says that he "expressed his refusal to assist the Mayor in persuading Ms. Figueroa not to file a sexual harassment complaint."  Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 27.  He does not reveal to whom these communications were made and he is not claiming to be a whistle-blower.  He also says that he wrote letters opposing his treatment by the Fire and Police Commission.  These facts do not establish that Jones was speaking out as a citizen.  The speech merely concerned his personal activities as Chief of Police.  Consequently, Jones cannot establish that his speech was constitutionally protected and summary judgment will be granted in favor of the Defendants on Jones' First Amendment retaliation claim.

## SECTION 1985

Finally, Jones alleges that the individual Defendants engaged in a conspiracy to deprive him of his civil rights because of his race.  See 42 U.S.C. § 1985. The Defendants argue that this claim must be dismissed because it is barred by the "intracorporate conspiracy doctrine," which allows governmental entities or agents acting within the scope of their employment, to be shielded from constituting a conspiracy under section 1985.  See Meyers v. Starke, 420 F.3d 738, 742 (8th Cir. 2005); Wright v. Illinois Department of Children and Family Services, 40 F.3d 1492, 1508 (7th Cir. 1994); Dombrowski v. Dowling, 459 F.2d 190, 196 (7th Cir. 1972).

25

Because the individual Defendants in this case were all employees of the City of Milwaukee during the time at issue, they are protected by the doctrine. Therefore, the court must grant summary judgment in favor of the Defendants on this claim.

### ORDER

For the reasons explained above, the court ORDERS that the "Defendants' Motion for Summary Judgment" (filed July 1, 2005) IS GRANTED. See Federal Rule of Civil Procedure 56.

IT IS FURTHER ORDERED that this action is dismissed upon its merits.

IT IS FURTHER ORDERED that the Clerk of Court shall enter a final judgment as a separate document. See Federal Rule of Civil Procedure 58. This judgment shall provide that:

> This action came on for hearing before the court, the Honorable Thomas J. Curran, District Judge, presiding, and the issues having been heard and a decision having been rendered,
>
> IT IS ORDERED AND ADJUDGED
>
> that Plaintiff Arthur L. Jones take nothing and that this action is dismissed upon its merits and that the Defendants City of Milwaukee, John O. Norquist, Robert J. Welch, Carla Y. Cross, Eric Mandel Johnson, Leonard J. Sobczak, Ernesto A. Baca, and Rosa Dominguez recover of the Plaintiff their costs of this action.
>
> Done and Ordered in Chambers at the United States Courthouse,

Milwaukee, Wisconsin, this 3rd day of November, 2005.

s/ Thomas J. Curran
Thomas J. Curran
United States District Judge

26

27